Argued and submitted February 22, 2013, affirmed June 4, petition for review denied December 11, 2014 (356 Or 575)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JIMMY RAY KELLY, JR.,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1000472; A146496

328 P3d 757

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. With her on the opening brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. Jimmy R. Kelly, Jr., filed the supplemental brief *pro se.*

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant, owner and president of a construction company, challenges a judgment of conviction for racketeering, ORS 166.720(3), under an indictment that alleged multiple theft- and fraud-related predicate offenses stemming from defendant's procurement and misuse of home-improvement loans. Defendant raises four assignments of error on appeal. He contends, first, that the trial court erred in denying his demurrer on the ground that the indictment was not sufficiently definite and certain; second, that the court erred in denying his motion for judgment of acquittal because there was insufficient evidence of the required intent; third, that the court impermissibly ranked his conviction as a "level-9" offense for purposes of sentencing; and fourth, that the court committed plain error by empanelling an anonymous jury. We reject defendant's second assignment of error without discussion and, as we explain below, otherwise affirm.[1]

Because the jury found defendant guilty, we review the evidence in the light most favorable to the state. *State v. Hale*, 335 Or 612, 614, 75 P3d 448 (2003), *cert den*, 541 US 942 (2004). Defendant was the owner and president of Jemm Corporation, doing business as Northwest Home Source (NHS). NHS focused on home-remodeling projects. In 2004, defendant hired Gary Remer to head NHS's sales and marketing.

In August 2005, NHS entered into a Merchant Origination Loan Agreement with First Security Bank. That agreement permitted First Security to purchase Retail Installment Contracts (construction contracts) from NHS after NHS delivered the original contract forms to First Security and First Security authenticated them. The required forms included a completion certificate that was to

---

[1] Defendant raises four additional claims in a *pro se* brief. He assigns error to the participation by an assistant attorney general in the prosecution against him; to the trial court's rejection of his requested special "pattern of racketeering" instruction; and to the court's denial of his demurrer, in which he argued that the court lacked jurisdiction. We reject those assignments of error without discussion. Later in this opinion, we address and reject defendant's remaining supplemental assignment of error regarding the court's instruction on the elements of the predicate fraud offenses.

be signed by both NHS and the homeowner *after* the job was substantially completed.

Between December 2005 and May 2006, NHS entered into construction contracts with five homeowners. In each instance, defendant or an NHS sales representative had the homeowner sign a series of documents that were represented to be a credit-financing application, but which also included a completion certificate. Each homeowner signed the completion certificate when completing the initial paperwork to contract with NHS. Defendant signed two of those completion certificates on behalf of NHS, and Remer signed the remaining three. Remer later testified that defendant instructed Remer and others to sign the completion certificates before the jobs were completed. NHS then submitted the completion certificates to First Security.

First Security transferred funds into a bank account belonging to NHS shortly thereafter. NHS did not use those funds for the remodeling projects for which they were issued. As a result of defendant's conduct, the homeowners and the bank suffered financial losses.

## DEMURRER

We first consider the trial court's denial of defendant's demurrer to the indictment on the ground that it did not adequately allege the enterprise element of the racketeering charge under the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO), ORS 166.715 to 166.735. We review a trial court's ruling on a demurrer to a charging instrument for legal error. *State v. Magana*, 212 Or App 553, 556, 159 P3d 1163, *rev den*, 343 Or 363 (2007).

The state charged defendant with one count of racketeering in violation of ORS 166.720(3), under an indictment that alleged 25 predicate offenses including theft, bank fraud, and wire fraud. The indictment charged, in relevant part:

"Defendant Jimmy Ray Kelly Jr. between December 8, 2005 and June 26, 2009, being associated with an enterprise, to wit: Jemm Corporation, doing business as Northwest Home Source, *and/or an association in fact including but not limited to: Jimmy Ray Kelly, Jemm Corporation, doing*

*business as Northwest Home Source, and Gary Remer and
others,* did unlawfully and knowingly conduct and partic-
ipate, directly or indirectly, in such enterprise through a
pattern of racketeering activity * * *[.]"

(Emphasis added.)

Defendant demurred to the indictment, arguing
that it was impermissibly indefinite and uncertain because
it did not "list who 'the others' are nor [did] discovery nar-
row the focus." The state responded that the identities of
the unnamed members of the alleged association-in-fact did
not constitute an element that must be pleaded and that
discovery identified the "names, dates of birth, addresses,
telephone numbers, statements, and other identifying infor-
mation of individuals and entities who were associated with
the named enterprise components during the racketeering
activity." The trial court denied the demurrer, agreeing with
the state that the identities of the unnamed "others" were
not material and therefore need not be pleaded.

On appeal, defendant assigns error to the trial
court's denial of his demurrer, renewing his argument that
the state's reference to unnamed "others" rendered the
indictment deficient both formally and functionally: for-
mally, in that, as a matter of law, the state was required to
allege the identities of the unnamed "others"; functionally,
in that the state's failure to so allege deprived defendant of
notice of the charge against him and hindered his ability to
adequately prepare a defense, because it enabled the state to
shift theories of the case during trial as needed. According
to defendant, in other words, the indictment is both insuffi-
ciently specific and impermissibly expansive.

The state counters that the trial court correctly held
that the indictment need not name the unknown individuals
associated with the illegal enterprise because their identity
was not a material element of the racketeering charge. The
state adds that any potential harm from lack of specificity
was adequately offset by the availability of additional infor-
mation through discovery. We agree with the state.

"A demurrer to an indictment on the ground that it
is not sufficiently definite or certain is properly raised under

ORS 135.630(2), which, by express reference, requires that the indictment conform to ORS 132.550(7)." *State v. Morgan*, 151 Or App 750, 753 n 4, 951 P2d 187 (1997), *rev den*, 327 Or 82 (1998) (emphasis omitted). Under ORS 132.550(7), an indictment must contain a "statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended[.]"[2]

We begin with defendant's argument that the indictment was insufficiently specific because it failed to specifically identify the unnamed "others." "[A]s this court so many times has held, an indictment generally is sufficient if it charges an offense in the words of the statute." *Hale*, 335 Or at 621; *see also State v. Fitzpatrick*, 149 Or App 246, 249, 942 P2d 819 (1997) (holding that an indictment phrased in the statutory language was sufficient to satisfy ORS 132.550(7)). Additionally, "as a matter of law, the identity of persons connected with a criminal offense need not be stated in an indictment unless such identity is an essential element of the crime charged." *State v. Shadley/Spencer/ Rowe*, 16 Or App 113, 121, 517 P2d 324 (1973).

To assess whether the identity of such persons is a material element that must be alleged in an indictment, we look to the plain language of the statute defining the crime charged. The Supreme Court explained the nature of that examination in *State v. Nussbaum*, 261 Or 87, 491 P2d 1013 (1971). In that case, the trial court had sustained demurrers by several defendants to indictments charging them with rioting, because the indictments failed to allege the names of co-offenders. 261 Or at 88-89.[3] We affirmed the trial court, and the Supreme Court reversed. The Supreme Court first

---

[2] Although defendant based his demurrer on ORS 135.630(6) (providing that a defendant may demur to the accusatory instrument when it appears on its face that it is "not definite and certain"), that provision "applies only to accusatory instruments other than indictments, *i.e.*, informations and complaints." *State v. Wright*, 167 Or App 297, 299 n 1, 999 P2d 1220, *modified on recons*, 169 Or App 78, 7 P3d 738, *rev den*, 331 Or 334 (2000).

[3] The grounds for challenging an indictment that were previously contained in certain of the statutes upon which the defendants in *Nussbaum* based their arguments—*former* ORS 132.520 to 132.540 (1971), *repealed by* Or Laws 1973, ch 836, § 358—are now stated in ORS 135.630(2) and ORS 132.550(7). *Shadley*, 16 Or App at 121 (so stating).

noted that "[i]t has always been the general rule in Oregon that an indictment in the language of a statute is good on demurrer." *Id.* at 91. The court then explained that, *"unless a statute required it, the name of a third person whose identity is not an essential element of an offense or material* to the commission thereof need not be stated[,]" *id.* at 96 (internal quotation marks omitted; emphasis in original), and, citing the language of the statute prohibiting rioting, reasoned:

> "[T]he names of three co-participants in the crime of rioting are not an essential element of that offense under ORS 166.040(1). All that is required by ORS 166.040(1), insofar as this element of that crime is concerned, is proof that there were 'three or more persons acting together.' For the same reasons, we hold that the names of such co-participants are not facts 'necessary to constitute' that crime for the purposes of determining the definiteness and certainty required of such an indictment by ORS 132.520(2), [ORS] 132.530, and [ORS] 132.540(1)(f). It follows that such an indictment need not allege the names of co-rioters or that names of the co-rioters are unknown to the grand jury.
>
> "We therefore hold that defendants are not entitled to demand that such facts be alleged because of their 'right to know what they must defend against.' For the same reasons it follows, in our opinion, that a defendant in such a case is not entitled to demand that such facts be alleged so as to 'enable him to make a defense.'"

*Nussbaum*, 261 Or at 96-97.

Following *Nussbaum*, we held in *Shadley* that, under a statute making it a crime to "furnish narcotic or dangerous drugs" and when the term "'[f]urnishes' means to sell, barter, exchange, give or dispose *to another*," the "identity of the person to whom drugs are furnished is not an essential element of this crime. It follows that * * * the trial court erred in holding the present indictments defective for failure to identify the person to whom drugs were furnished." *Shadley*, 16 Or App at 122 (emphasis in original). The same rules and reasoning apply here.

The state charged defendant with violating ORS 166.720(3), which provides, "It is unlawful for any person employed by, or associated with, *any enterprise* to conduct or participate, directly or indirectly, in such enterprise through

a pattern of racketeering activity \* \* \*." (Emphasis added.) "Enterprise" is a statutorily defined term. An enterprise "includes *any* individual, sole proprietorship, partnership, corporation, business trust or other profit or nonprofit legal entity, *and includes any* union, association or group of individuals associated in fact although not a legal entity, and both illicit and licit enterprises and governmental and nongovernmental entities." ORS 166.715(2) (emphasis added).

Defendant does not dispute that the indictment charges the offense of racketeering in the language of the relevant statutes. Based on that statutory language and the holdings in *Nussbaum* and *Shadley,* we conclude that the names of the additional "others" referenced in the indictment do not constitute a material element of the charge of racketeering at issue here. All that is required by the text of ORS 166.720(3) and ORS 166.715(2), insofar as the enterprise element is concerned, is that the defendant was associated with "any enterprise," which may "include" "any" individual or entity. *See State v. Cheek,* 100 Or App 501, 505, 786 P2d 1305, *rev den,* 310 Or 121 (1990) ("It is apparent that the legislature wanted to include *every* kind of enterprise within the definition of ORS 166.715(2)." (Emphasis in original.)). It follows that the identities of the unnamed members of the association-in-fact are not required here to render the alleged enterprise in the indictment sufficiently specific.

Defendant relies on *State v. Kincaid,* 78 Or App 23, 714 P2d 624 (1986), in an attempt to persuade us otherwise. In *Kincaid,* we reversed the trial court's denial of the defendant's demurrer to an indictment charging him with racketeering under ORS 166.720(3). 78 Or App at 25, 31. On appeal, the defendant challenged the state's "pattern of racketeering activity" allegation, which alleged, in relevant part, that the defendant had participated "in such enterprise through a pattern of racketeering activity, to-wit: thefts in the first degree[.]" *Id.* at 25-26. Thus, the issue in *Kincaid* was the requisite level of specificity when pleading the predicate offenses underlying a charge of racketeering. *Id.* at 27. We agreed with the defendant's contention that, although the indictment "identified theft as the *kind* of predicate offense, it was defective because it failed to describe the *incidents* of theft which the state intended to prove."

*Id.* at 26, 30-31 (emphasis in original). According to defendant, the deficiency in the indictment at issue in this case is analogous to the deficiency of the indictment in *Kincaid*. But *Kincaid* is distinguishable for several reasons.

As an initial matter, *Kincaid* dealt with a different element of racketeering—the pattern-of-racketeering-activity element—than is at issue here. The pattern-of-racketeering-activity element is subject to a particular statutory specificity requirement. *See* ORS 166.720(6).[4] No other element of racketeering is subject to such a requirement. The existence and terms of such a requirement for the pattern-of-racketeering-activity element suggests that the standard of specificity required when pleading the offenses predicate to a racketeering charge is not the same standard by which the sufficiency of the enterprise allegation should be measured.

Additionally, although defendant likens the allegation in this case to the defective allegation in *Kincaid*, the state in this case alleged the enterprise element with greater specificity than the state in *Kincaid* alleged the pattern-of-racketeering-activity element. The state in *Kincaid* alleged for that element only that the defendant in that case had committed "thefts in the first degree[.]" The state in *Kincaid*

---

[4] The text of ORS 166.720(6) provides, in full:

"An allegation of a pattern of racketeering activity is sufficient if it contains substantially the following:

"(a) A statement of the acts constituting each incident of racketeering activity in ordinary and concise language, and in a manner that enables a person of common understanding to know what is intended;

"(b) A statement of the relation to each incident of racketeering activity that the conduct was committed on or about a designated date, or during a designated period of time;

"(c) A statement, in the language of ORS 166.715(4) or other ordinary and concise language, designating which distinguishing characteristic or characteristics interrelate the incidents of racketeering activity; and

"(d) A statement that the incidents alleged were not isolated."

ORS 166.715(4), in turn, provides, in relevant part:

"'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents * * *."

listed *no* specific incidents that formed the basis for the predicate offenses. In contrast, in the indictment in this case, the state alleged that defendant was "associated with an enterprise" and further specified the enterprise as "Jemm Corporation" or an association-in-fact or both. The indictment then named four specific individuals or entities as members of the association-in-fact before referencing the unnamed "others."

Two other cases concerning the sufficiency of the pleading of the ORICO enterprise element, *State v. Vermaas*, 116 Or App 413, 841 P2d 664 (1992), *rev den*, 316 Or 142 (1993), and *State v. Fair*, 326 Or 485, 953 P2d 383 (1998), are instructive. In *Vermaas*, the defendant, who had admitted that he was growing and selling marijuana and using the proceeds to buy rental properties, argued that the enterprise element as pleaded in the indictment charging him with racketeering lacked the specificity required under ORS 132.550(7). 116 Or App at 416. That indictment alleged that, over a period of "approximately three years," the defendant, "along with several named individuals, had conducted an 'enterprise through a pattern of racketeering activities' and 'thereby' committed two or more of the alleged predicate offenses." *Id.* at 416-17. The defendant contended that he was unable to tell what the alleged unlawful enterprise was because the predicate offenses were alleged to have extended over multiple years. *Id.* at 417. In support of his argument, the defendant relied exclusively on *Kincaid*. We concluded that the indictment was sufficient and rejected the defendant's argument and reliance on *Kincaid*, reasoning:

> "*Kincaid* is distinguishable. There, the ORICO indictment alleged only that the defendant engaged in a 'pattern of racketeering activity, to wit: thefts in the first degree.' We held that the allegation of the predicate offenses was not specific as to time of the theft and did not describe them in any detail.

> "The indictment here does not suffer from the defects identified in *Kincaid*. It is specific as to the periods of time when the several offenses occurred and describes each in detail."

*Id.* (citation omitted).

In *Fair*, the Supreme Court approved the sufficiency of the pleaded enterprise element. The state charged the defendant with racketeering, alleging five predicate offenses. 326 Or at 488. With respect to the enterprise element, the indictment stated that the defendant was associated with "the Woodland Park Bloods, a street gang not a legal entity but an association in fact[.]" *Id*. The defendant demurred to the indictment on grounds that, *inter alia*, it was not sufficiently "definite and certain" because it quoted, essentially *verbatim*, the text of ORS 166.175(4) in alleging a "pattern of racketeering activity." *Id*. at 487-88. The trial court denied the demurrer, reasoning that it tracked the statutory language, and we reversed. *Id*. at 489. On review, the Supreme Court disagreed and affirmed the trial court. In doing so, it observed that the indictment stated the "particular circumstances" of both the predicate offenses and the enterprise. *Id*. at 490. In addition, the Supreme Court held that the state need not also specify the "particular circumstances" of its theory or theories of nexus instead of using the statutory definition of "pattern." *Id*. After noting that the indictment sufficiently spelled out six alternative relationships, the court explained that

> "[a]t its core, defendant's argument is that the charged crime is complex, making the indictment difficult to defend against. But complex is not the same as uncertain, and difficult is not the same as indefinite. Even if it is complex or difficult to defend against, an indictment may allege multiple theories of committing the same crime in the words of the statute defining the crime. The racketeering indictment in this case was sufficiently definite and certain to fulfill the constitutional and statutory functions that this court has identified."

*Id*. at 491.

Here, the relevant allegations are more specific than both those disapproved in *Kincaid* and those approved in *Vermaas*, and similar to those approved in *Fair*. Furthermore, *Fair* establishes that racketeering allegations that track the statutory language may suffice even when that language is open-ended and susceptible to multiple possible interpretations. Based on the foregoing, we hold that the trial court did not err in denying defendant's demurrer to

the indictment based on its conclusion that the identities of the unnamed "others" was not a material element of racketeering that must be alleged.

We turn now to defendant's argument that the state's reference to unnamed "others" rendered the indictment impermissibly expansive and, therefore, vague. Defendant argues that, without knowing who the "others" were, he could not anticipate the nature of the state's case against him and that, in any event, such open-ended language would permit the state to change theories at will as the evidence developed. Defendant also contends that this is an instance in which the discovery process would not remedy that defect. We disagree. We do not decide whether reference to the unnamed "others" makes the indictment impermissibly vague. Instead, assuming without deciding that it does, we hold that discovery in this case was sufficient to cure any such imprecision in the indictment.

Defendant acknowledges that, in the general run of cases, "imprecision in the instrument resulting from the use of the statutory language may be cured by pretrial discovery." *State v. Andre*, 178 Or App 566, 569, 38 P3d 949 (2002). But defendant also points, again, to *Kincaid*, in which we stated:

> "The very volume of the discovery material, together with the large number of predicate offenses on which the state can potentially rely in ORICO prosecutions, is what makes discovery inadequate as an alternative to notifying an ORICO defendant by indictment of the 'acts constituting the offense in ordinary and concise language * * * in such manner as to enable a person of common understanding to know what is intended.' Stated differently, discovery is not a satisfactory substitute for specificity in indictments in ORICO cases, because effective notice is as much obscured by too much information as it is denied by too little information."

78 Or App at 30 (quoting ORS 132.550 (7)) (omission in *Kincaid*). Defendant merely quotes *Kincaid* without articulating how this court should apply it to the facts of this case. To the extent that defendant is suggesting that the volume

of discovery in this case rendered discovery an inadequate alternative to specificity, the mere suggestion is insufficient.[5]

Furthermore, defendant ignores other statements in *Kincaid* that undermine the implication that discovery can *never* be a "satisfactory substitute for specificity in indictments in ORICO cases." *Kincaid*, 78 Or App at 30. For example, we noted in that case that "an unspecific indictment cannot be saved by the availability of discovery *if* the discovery is unlikely to inform the defendant of the specific criminal conduct the state intends to prove." *Id.* at 29 (emphasis added). We also observed that the primary case on which we relied, *State v. Sanders*, 280 Or 685, 572 P2d 1307 (1977), contained the observation that "[i]n some instances the availability of discovery can remedy a deficiency in the specificity of the indictment[.]" *Kincaid*, 78 Or App at 28 (quoting *Sanders*, 280 Or at 690).

This is one such instance. As noted above, in its response to defendant's demurrer, the state asserted that the "names, dates of birth, addresses, telephone numbers, statements, and other identifying information of the individuals and entities who were associated with the named enterprise components during the racketeering activity" were identified in discovery. Defendant does not assert otherwise.

In sum, the trial court did not err in denying defendant's demurrer. The state sufficiently alleged the enterprise element in the indictment charging defendant.

## SENTENCING

We briefly consider and reject defendant's third assignment of error. On appeal, defendant reprises his argument that the trial court erred when it ranked his

---

[5] In *Magana*, 212 Or App at 560, we rejected the defendant's reference to the volume of discovery:

"defendant's arguments in this case do not focus on the kind of discovery available; instead, they are directed to its volume: '[D]efendant could not realistically be expected to sift through [discovery documents] and divine which purposed acts and purported omissions corresponded to which alleged crimes.' It may well be difficult to review large amounts of discovery, but merely asserting that there is much of it does not establish that it was insufficient to illuminate the indictment."

(Brackets in original.)

conviction for racketeering as a "level-9" offense on the crime-seriousness scale of the sentencing guidelines grid.[6] Citing *Blakely v. Washington*, 542 US 296, 301, 124 S Ct 2531, 159 L Ed 2d 403 (2004), defendant contends that, because racketeering is an unranked offense under the sentencing guidelines, the court cannot rank a conviction for that crime as high as it did without factual findings by the jury to support such a ranking.

That argument is foreclosed by our recent holding in *State v. Ibarra-Ruiz*, 250 Or App 656, 663, 282 P3d 934, *rev den*, 353 Or 127 (2012), that *Blakely* does "not apply to discretionary matters decided by trial courts, such as the ranking of [unranked] offenses under the sentencing guidelines." In *Ibarra-Ruiz*, we also approvingly cited a pre-*Blakely* opinion, *State v. Coleman*, 130 Or App 656, 666-67, 883 P2d 266 (1994), *rev den*, 320 Or 569 (1995), in which we affirmed that trial courts have the discretion to assign a defendant's racketeering conviction a crime-seriousness level higher than that of the underlying crime, as the trial court here did. *Ibarra-Ruiz*, 250 Or App at 663. In short, "it is clear that the sentencing court has the discretion to determine the seriousness of an unranked offense." *Id.* Defendant's reliance on *Blakely* to argue otherwise is unavailing.

## JUROR ANONYMITY

In his next assignment of error, defendant argues that the trial court erred by empanelling an anonymous jury. According to defendant, the trial court's unexplained use of numbers, instead of names, to refer to the jurors created a risk that the jury would regard defendant as dangerous. As a result, contends defendant, the trial court

---

[6] As the Supreme Court has summarized,

"The centerpiece of the sentencing guidelines is the 99-block Sentencing Guidelines Grid. *See* OAR ch 253, app 1 (setting out the grid). A 'Crime Seriousness Scale' serves as the vertical axis of the grid. * * * A 'Criminal History Scale' serves as the horizontal axis of the grid. * * * The appropriate sentence for a given felony conviction is determined by (1) locating the appropriate category for the crime of conviction on the Crime Seriousness Scale; (2) locating the appropriate category for the convicted offender on the Criminal History Scale; and (3) locating the grid block where the two categories intersect."

*State v. Davis*, 315 Or 484, 487, 847 P2d 834 (1993).

violated his state and federal constitutional rights to a fair and impartial trial and to the presumption of innocence. Defendant concedes that he did not preserve this claim of error but urges this court to exercise its discretion to correct it as "plain error" under ORAP 5.45. The state counters that the alleged error in empanelling the jury is not evident on the face of the record and therefore does not qualify as plain error. We affirm despite any error, as we explain below.

Our review of the trial transcript, as well as the trial court file, reveals the following relevant facts. On the first day of trial, before *voir dire*, the trial court discussed what it described as "housekeeping" matters with the parties, including jury selection. In that context, the court told the parties:

> "We'll put together a jury chart for you, and it'll be on one page. At the top of the page—well, the top half of the page it will be as if you're looking at the jurors in the jury box. And we'll refer to the jurors by juror number, not by name. And juror number—seat number 1 will be in the back left, moving left to right."

The court then also discussed the configuration of the courtroom and the procedure for approaching witnesses with an exhibit. Next, for "the last local courtroom rule," the court informed the parties that there would be no sidebar conferences. The court did not offer any further commentary of any sort regarding the use of juror numbers instead of names, and neither party objected to or asked for clarification regarding the matter.

Later that day, the court and parties conducted *voir dire*. After addressing preliminary matters, the court introduced defense counsel who began by stating, "Good afternoon. I don't know any of your names, that's not being provided ***." Defense counsel initially stumbled when addressing prospective jurors, calling on one as "Mr.—Mr. 49[,]" and then referring to another, "Mr.—I'm sorry. I just—force of habit. Juror number 38." Defense counsel and the state then proceeded to question the prospective jurors, referring to them at all times—as did the court—by their juror numbers.

The following day, the trial court issued a permit authorizing a local television news reporter to attend and videotape defendant's trial that day. In the course of the proceedings that morning, the court explained to the jury:

"There also—I can also let you know that it's possible that later in the day there will be a camera in the courtroom from a news agency. The local Uniform Trial Court Rules require that the camera never be directed at the jury. It can be on the witness, me, the lawyers, but not you. So I want to give you the assurance that none of you will be filmed. And if that does happen, then their permit will be forfeited and appropriate measures taken."

Following the parties' closing arguments, the trial court excused the jurors to begin deliberating and then turned to address the two alternate jurors, telling them:

"Okay. I still want to have your names. If you'd write down your names, your juror number, and phone numbers where I can reach you. It's still possible that you could be called on to deliberate. And I'm not going to get into the scenarios where that might happen, but I do need to have you write down your name and your number—your juror number and your phone number. That's for my eyes only, and I'll get a—I'll give you a call."

After the trial court announced the verdict reached by the jury, the court noted that the verdict form had been "dated this 18th day of June, but it's not yet signed[,]" and asked the presiding juror to sign it. The presiding juror confessed confusion as to whether "I was to sign it or put my number on it[,]" to which the trial court responded, "Signature, please."

With those facts in mind, we turn to the merits of defendant's argument. To constitute plain error for purposes of ORAP 5.45, the error must satisfy three criteria: (1) it must be legal error; (2) it must be "apparent," such that "the point must be obvious, not reasonably in dispute"; and (3) it must appear on the face of the record, such that we "must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). If the asserted

error satisfies those criteria, we then must decide whether to exercise our discretion to correct the error. *Id.* at 382.

As the Supreme Court in *Ailes* underscored,

"Even if the error meets that test, \*\*\* the appellate court must exercise its discretion to consider or not to consider the error, and if the court chooses to consider the error, the court must articulate its reasons for doing so. This is not a requirement of mere form. A court's decision to recognize unpreserved or unraised error in this manner should be made with utmost caution. Such an action is contrary to the strong policies requiring preservation and raising of error."

*Id.* (citation omitted). "The criteria we must apply ensure that review of plain error will be the exception, and not the rule. Those criteria ensure that the appellate courts will bypass principles of preservation only in extraordinary circumstances." *State v. Jury*, 185 Or App 132, 138-39, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003). In determining whether we should exercise our discretion under *Ailes*, we generally consider "the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice." *Jury*, 185 Or App at 139. With those factors in mind, and assuming, without deciding, that the trial court here did commit plain error by empanelling an anonymous jury, we decline to exercise our discretion to address any such error.

In arguing that empanelling an anonymous jury violated his constitutional right to an impartial jury, defendant relies heavily on *State v. Sundberg*, 349 Or 608, 247 P3d 1213 (2011).[7] In *Sundberg*, the Supreme Court concluded that

"[e]mpanelling an anonymous jury *can* affect a defendant's right to \*\*\* an impartial jury \*\*\* because it is an external factor—not the facts or the law—that *may* compromise the jury's ability to remain impartial by implying that a

---

[7] We reject the state's argument that *Sundberg* is not relevant here because it was not decided until after defendant's trial. *See Jury*, 185 Or App at 136 (holding that appellate courts analyze plain error "by reference to the law as of the time the *appeal* is decided[,]" rather than the extant law at the time of the disputed trial court ruling) (emphasis added)).

defendant is dangerous, thus undermining the presumption of innocence."

349 Or at 620 (emphasis added). In assessing the possibility that the jury's impartiality may have been compromised by the trial court, the Supreme Court looked to the totality of the circumstances of the case:

> "The possibility that jurors might draw such an implication was heightened in this case because a number of prospective jurors had participated in standard *voir dire*, where they had disclosed their names, addresses, and employers, on the same day in another courtroom. Moreover, the risk that the use of an anonymous jury may have prejudiced the defendant was particularly great in this case. * * * In contrast to cases in which there is physical evidence of harm, expert testimony regarding DNA or other evidence linking defendant and victim, or other witnesses who provide admissible independent testimony to support the state's case, this case, in large part, turned on whether the jury believed defendant or the victim.
>
> "In the circumstances of this case, the unexplained use of an anonymous jury created too great a risk that the jury may have believed that defendant was dangerous—and, therefore, that he was more likely to be guilty, denying defendant the right to a trial by an impartial jury. The error was not harmless, and defendant is entitled to a new trial."

*Id.* at 625.

By contrast, here, defendant points to no such circumstances, nor does he articulate how an anonymous jury caused him harm, beyond summarily asserting that it caused the jury to believe that he may have been dangerous. We find no indication in the record, however, that the jury drew such a conclusion or even that the possibility that they may have was heightened.[8] Defendant was on trial for using his business to commit white-collar crime, as opposed to committing a person crime such as, for example, sexual abuse, as in *Sundberg*, or aggravated murder, as in *State v.*

---

[8] The fact that defendant did not object to the empanelling of an anonymous jury at trial indeed suggests the possibility that defendant may have perceived no such harm.

*Rogers*, 352 Or 510, 288 P3d 544 (2012), the only other case besides *Sundberg* to consider this issue. Thus, in the totality of the circumstances of this case, we are not persuaded of the plainness of the risk that the jury's deliberations were affected because they perceived defendant to be dangerous.

Additionally, there were no circumstances marking the use of juror anonymity as somehow conspicuous such as there were in *Sundberg*, as quoted above. *See also Rogers*, 352 Or at 543 (noting that the jurors were told that the defendant's attorneys, but not the defendant himself, would have access to their names and other identifying information). And, in both *Sundberg* and *Rogers*, the implication that the defendant was dangerous bore much more directly on a dispositive issue: in *Sundberg*, "the state's case, * * * in large part, turned on whether the jury believed defendant or the victim[,]" 349 Or at 625; *Rogers* involved "a penalty-phase proceeding where [the] defendant's 'future dangerousness' was specifically at issue." 352 Or at 544. No such linkage or association between any suggestion of defendant's potential dangerousness and the crime charged or the proceeding appears in this case. Indeed, as the state argues, it is possible that the jury concluded that juror anonymity at trial was due to a factor unrelated to defendant, namely, the request of the news media to bring a camera into the courtroom.

In sum, there is little likelihood that any error by the trial court in empanelling an anonymous jury compromised the jury's impartiality or affected the verdict. Given "the nature of the case, the gravity of the error, and the ends of justice[,]" *Jury*, 185 Or App at 139, we decline to exercise our discretion under *Ailes*.

## INSTRUCTIONAL ERROR

Acting *pro se*, defendant contends in an additional assignment of error that the trial court committed plain error by failing to instruct the jury that materiality of a falsehood is an element of the fraud crimes alleged by the state as predicate offenses. Defendant acknowledges that he did not object to the trial court's fraud instruction but urges us to exercise our discretion under ORAP 5.45 to consider it

as "plain error." Defendant is correct that materiality is an essential element of the crimes of federal bank fraud and mail fraud. *See Neder v. United States*, 527 US 1, 25, 119 S Ct 1827, 144 L Ed 2d 35 (1999) (so holding). Defendant is also correct that the trial court did not instruct the jury accordingly. However, assuming, without deciding, that the trial court thus committed plain error, we decline to exercise our discretion to correct the error. *See Ailes*, 312 Or at 382 (stating that an appellate court "must exercise its discretion to consider or not to consider the error"); *see also Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998) (instructional error "requires reversal only if the jury instructions given by the trial court, considered as a whole, cause prejudice to the party requesting the instruction").

In the context of federal mail fraud and bank fraud, the materiality of a fraudulent statement turns on whether "it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 US at 16 (internal quotation marks omitted; brackets in original); *see also* Ninth Circuit Model Jury Instruction 8.127 ("In order for the defendant to be found guilty of [bank fraud in violation of 18 USC section 1344(2)], the government must prove * * * beyond a reasonable doubt * * * the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property[.]"). Here, a jury found defendant guilty of racketeering based on predicate offenses including bank fraud and wire fraud after the state introduced evidence that defendant falsely represented to First Security that the remodeling projects were completed and that First Security transferred funds to defendant based on those representations. Defendant does not contest those aspects of his trial or conviction. Defendant does not even argue on appeal that the fraudulent statements were not material. Because defendant does not identify any prejudice and we discern none, we do not exercise our discretion to correct any error. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (holding that there is no prejudice if an error had little likelihood of affecting the verdict).

In conclusion, we hold that the trial court did not err when it denied defendant's demurrer to the indictment or when it determined the crime seriousness score for defendant's racketeering conviction. We decline to exercise our discretion to correct any error that the court may have committed in empanelling an anonymous jury and in delivering the fraud instruction.

Affirmed.